UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY D. SHULTS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13 CV 2326 CDP |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

## **MEMORANDUM AND ORDER**

*Pro se* petitioner Timothy Shults[1] is currently incarcerated at the Potosi Correctional Center in Mineral Point, Missouri. Shults was sentenced to life imprisonment without parole following a bench trial in which he was found guilty of murder in the first degree. Shults' conviction and sentence were affirmed by the Missouri Court of Appeals. Ex. E., Memorandum Supplementing Order Affirming Judgment Pursuant to Rule 30.25(b), No. ED97418 (Mo. Ct. App. December 4, 2012) (unreported).

This matter is now before me on Shults' petition for writ of habeas corpus under 28 U.S.C. § 2254. In Shults' petition he raises one claim for federal relief. Shult's argues that his conviction was obtained in violation of his Fifth Amendment rights because the Missouri courts should have suppressed his

---

[1] Also written as Timothy Schults in some Missouri Court documents.

statements to police about the location of the victim's body and belongings, and should have excluded the evidence discovered as a result of these statements.

This claim was raised before the Missouri Court of Appeals, who considered it on the merits and denied it. The Missouri court correctly determined the facts and applied the law, and so Shults' claim for habeas relief fails.

**I. Factual Background**

Shults' conviction arose from his murder of Deborah Marsch, who went missing on July 3, 2009. On July 5, 2009, Lieutenant Kyle Kitcher and two other Union police officers went to the home of Shults' ex-wife Lorraine Doyle in search of Shults for an unrelated report of domestic abuse involving his estranged wife Betty Shults. Shults had recently been hospitalized at the VA Hospital for depression and anxiety, and was found in a closet of Ms. Doyle's home. He was handcuffed and escorted outside the home. Lt. Kitcher sat Shults on a curb and inquired about the missing woman. Lt. Kitcher showed Shults a picture of the woman and asked if he had seen her, and Shults reacted violently with "No."

Shults was arrested for the domestic violence crime against Betty Shults and taken to the Union police station. Lt. Kitcher and Detective Steve Sitzes, of the Washington police, took Shults into an interview room and activated the recording

system.[2] Shults was non-responsive to most questions, answering, when informed of his *Miranda* rights, "I don't have the mental capacity to understand anything." As the officers continued to explain the rights and attempted to question him about his understanding, Shults continued to be non-responsive, stared at the floor or put his head on his knees, and again stated "I am not of sound mind to understand anything." When he did speak his voice was quavery and he referred to being anxious. The officers were in plain clothes, their questioning was low-key and generally non-confrontational, and Shults was allowed to walk around the room, at times sitting, at times squatting on the floor. The officers brought him food (hamburger, fries, drink), and Shults continued to either not answer or say he did not know the answers. Because the officers did not believe he did not understand, they asked his ex-wife to come to the station to talk to him to help assess his mental mental status. When she arrived they specifically told her they were not asking her to ask him any questions about the missing woman.

When Ms. Doyle arrived, she spoke with Shults and assured him of her support. At one point she told him that whatever he told her was not admissible in evidence. The officers had not instructed her to say this. Off and on during his conversation with his ex-wife, Shults sobbed and stated that he wanted to die. She

---

[2] All of what happened at the police station was recorded, and the state introduced the videos at the motion to suppress hearing. I have independently reviewed the various videos, and the Court of Appeals' detailed summary of the evidence and its description of the interrogation and confession is entirely accurate and consistent with those recordings. I therefore am not repeating it all here, but provide only an abbreviated summary.

urged him to do what was right and cooperate with the police.  After Shults spent some time alone with Ms. Doyle, Lt. Kitcher then rejoined them in the interview room, and asked if Shults would take him to the missing woman.  Shults, using a map provided by the police, indicated the whereabouts of the missing woman and wrote directions to get there.

Once he gave directions to the body, Shults became much more responsive and began speaking more coherently.  Shults had only been at the police station an hour and half before giving Lt. Kitcher directions to the body.  Shults led the officers to the woman's body, which was hidden off a road in the woods, and then proceeded to offer the locations where he had hidden her clothes, teeth, and wig.  He explained that he removed her clothing after killing her in hopes that would keep her from being identified.  After locating these items, the officers returned to the scene of the crime with Shults, and recorded another reading of the *Miranda* warnings.  Shults eventually stated that he understood his rights and, in a relatively composed manner, described on the recording how he killed the woman.

Lt. Kitcher took Shults back to the police station, where he again read the *Miranda* rights and waiver form to Shults.  Shults signed the waiver in the two

designated areas and again proceeded to calmly describe the murder of the woman to Lt. Kitcher.³ He then wrote out a letter apologizing to the victim's family.

## II. Procedural Background

Shults filed a motion to suppress, and the trial court heard testimony of the officers involved and reviewed the video of the interviews. The Court denied the motion to suppress. The state originally indicated an intent to seek the death penalty, but before trial, Shults waived his right to a jury trial and in exchange, the state agreed not to seek the death penalty.

Shults did not contest the state's version of the murder, which, based on his confession, was that he had come upon the victim, a stranger, and killed her because he was angry with the way his life had been going. Instead, he presented a defense that he lacked the mental capacity to form the intent necessary to commit first degree murder. He presented evidence that he suffered from a mental disease or defect because of a traumatic brain injury that had resulted from a construction accident.

The court found defendant guilty of first degree murder and sentenced him to life imprisonment without parole. He appealed only the issue of the

---

³ During this part of the recordings Shults appears very calm, although he again states that he wishes he could die. He thanks Lt. Kitcher for treating him well, and discusses his concerns that his children will be labeled the children of a murderer. While waiting for the booking process, he engages in calm small talk with assisting officers, and he is fully cooperative while DNA samples are taken and during the other routine procedures.

voluntariness of his confession. The Missouri Court of Appeals affirmed the conviction.

### III. Discussion

Under 28 U.S.C. § 2254(d) a court shall not grant habeas relief to a claim adjudicated on the merits in State court proceedings unless the state proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (2012). "A state court decision is 'contrary to' clearly established federal law if it either arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court arrives at a result opposite to one reached by the Supreme Court on materially indistinguishable facts." *Miller v. Dormire*, 310 F.3d 600, 603 (8th Cir. 2002) (internal quotation marks and brackets omitted). A state court's decision is "an unreasonable application of federal law" if the decision properly identifies the governing Supreme Court legal principle but "unreasonably applies that principle to the facts of the prisoner's case." *Addai v. Schmalenberger*, No. 776 F.3d 528, 532 (8th Cir. 2015). Upon federal habeas review under 28 U.S.C. § 2254, the factual determinations of the State court are presumed to be correct. 28 U.S.C. §

2254(e)(1). The incarcerated party bears the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

### Voluntariness of Confession

Shults seeks habeas relief on the claim that his confession to the police, including his statements about the locations of the woman's body and her belongings, was not voluntary because he could not fully understand the *Miranda* warnings. He argues the statements were a result of police coercion and should have been suppressed at trial. Shults' petition first alleges that he "did not have the mental capacity to understand or waive his rights." He further alleges the police used his ex-wife as an agent to obtain these statements.

**A. Knowing and Intelligent Waiver**

The question of whether Shults waived his *Miranda* rights knowingly, intelligently, and voluntarily, turns on "the particular circumstances surrounding that case, including the background, experience, and conduct of the accused." *N.C. v. Butler*, 441 U.S. 369, 374-75 (1979). The Fifth Amendment privilege is knowingly and intelligently waived if it can be shown Shults understood he had the right to remain silent or right to an attorney. The Constitution "does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colo. v. Spring*, 479 U.S. 564, 574 (1987).

The Missouri Appellate Court, in finding that Shults knowingly and intelligently waived his rights, stated:

> Here, Lt. Kitcher, who had known defendant for years, testified that he believed that defendant's initial claim that he did not understand was an "act," and there was evidence that defendant had the intellectual capacity to understand the warnings in that defendant had served in the Marines and in the National Guard where he had received military police training. Moreover, a defendant's actions after he was given the warnings can show his understanding. *See* State v. Gray, 100 S.W.3d 881, 887 (Mo.App. 2003). The court could consider that although defendant initially claimed he did not have the mental capacity to understand the Miranda rights or know basic facts about his family, within an hour and a half, his demeanor drastically transformed, and he became composed, alert, and responsive, and he exhibited rational behavior and coherent speech. *See* State v. Knese, 985 S.W.2d 759, 766 (Mo. Banc 1999).
>
> It was within the trial court's discretion to find that defendant was not credible when he claimed he did not understand the warnings, but was credible when, a few hours later, he said he did understand the warnings. *See* Rousan, 961 S.W.2d at 845.

Ex. E. at 14—15.

This determination that Shults was able to understand the meaning of the *Miranda* warnings is fully supported by the evidence, and the Missouri Appellate Court's factual determination is correct even in the absence of the presumption of correctness.

### B. Voluntary Waiver

A waiver of one's *Miranda* rights is found to be voluntary when it is "not the product of intimidation, coercion, or deception," but rather the product of one's "free and deliberate choice." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005)

Shults has the burden of proving "that his statements were the product of police coercion and his 'will [was] overborne and his capacity for self-determination critically impaired.'" *Reese v. Delo*, 94 F.3d 1177, 1183 (8th Cir. 1996) (*quoting Culombe v. Conn.*, 367 U.S. 568, 602 (1961). "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colo. v. Connelly*, 479 U.S. 157, 167 (1986)).

The Missouri Court of Appeals found the police did not engage in trickery or coercion:

> "[I]n order for alleged 'coercive tactics' or 'trickery' by police interrogation to be of a nature that makes further statements of a defendant involuntary, those tactics must demonstrate the defendant's 'will was overborne as a result of said tactics." State v. Mateo, 335 S.W.3d 529, 537 (Mo.App. 2011). Here, Lt. Kitcher made efforts to make defendant comfortable, and allowed him to squat, sit, stand, and move about at will. He provided defendant with food of his choice. There were breaks in questioning, and the police brought Ms. Doyle to calm defendant down. The officers did not compose defendant's confession for him, and they did not strike, threaten, or make promises to defendant.
>
> Likewise, State v. Perkins, 753 S.W.2d 567 (Mo.App. 1988), on which defendant also relies, does not apply to these facts. . . . Unlike the brother in Perkins, Ms. Doyle was not paid to elicit information, and was not requested to obtain information. The trial court did not clearly err in finding that Ms. Doyle was not an agent of the police, and the conversation with Ms. Doyle was not evidence of police coercion.

Ex. E. at 16—17.

The evidence shows there were never more than two officers in the interrogation room with Shults at any time, Shults was uncuffed during most of the interrogation, he was allowed to move freely about the interview room, he was provided food and drink and asked repeatedly if he was comfortable. The officers wore jeans and not their police uniforms, and the interrogation was not overly long. Shults was only there for an hour and a half before taking the officers to the body and belongings of the missing woman. Although his ex-wife did urge him to tell the police what he knew, she did so in the context of telling him she supported him and would stand by him even if he had done something wrong. Ms. Doyle testified, consistently with the testimony of the police, that she believed she was brought in to the police station to help calm Shults down because they were investigating the domestic abuse allegation involving his current wife. Although Lt. Kitcher told her that a woman was missing, she had told the police she was sure he would not have been involved in anything like that. Lt. Kitcher testified that he did not give her any particular questions to ask Shults.

The Missouri Court of Appeals identified the proper legal standard and determined that the confession was not the result of coercion or trickery. The Missouri court's determination is not an unreasonable application of federal law or an unreasonable determination of the facts, and so Shults has failed to show that he is entitled to habeas relief.

### IV. Certificate of Appealability

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a 28 U.S.C. § 2254 proceeding unless a circuit justice or judges issues a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A). To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right. *Id.* § 2253(c)(2); *see Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). I find that reasonable jurists could not differ on any of Shults' claims, so I will deny a Certificate of Appealability on this claim.

Accordingly,

**IT IS HEREBY ORDERED** that the petition for writ of habeas corpus [#1] filed by Timothy Shults is DENIED.

A separate judgment in accord with this Memorandum and Order is entered today.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 1st day of June, 2015.